NEW YORK STATE LABOR RELATIONS BOARD, JOHN P. BOLAND and Others, as Members of and Constituting the New York State Labor Relations Board, Petitioners, Respondents, v. FRANK G. SHATTUCK Co., Appellant, and CHAIN SERVICE RESTAURANT EMPLOYEES UNION, LOCAL 42, Intervenor, Respondent.

First Department, June 28, 1940.

*Nathan L. Miller* of counsel [*Thomas I. Sheridan* and *Jas. Nevins Hyde* with him on the brief; *Hartman, Sheridan & Tekulsky,* attorneys], for the appellant.

*Daniel Kornblum* of counsel [*Bernard Jaffe* with him on the brief], for the petitioners-respondents.

*Sidney Elliott Cohn* of counsel [*Hyman N. Glickstein* and *Irving Robert Feinberg* with him on the brief; *Boudin, Cohn & Glickstein,* attorneys], for the intervenor-respondent.

CALLAHAN, J.   The order of the Board required the appellant to cease and desist from interfering with its employees' joining labor unions, from discriminating against employees who associated themselves with such unions, and from keeping under surveillance the union activities of its employees.

The order of the Board also directed appellant to reinstate four employees with back pay, upon the ground they had been discharged or refused employment because of labor activities.

The Board's order was based on charges of a labor union.   This complaint was issued in March, 1938.   Hearings were had before a trial examiner, which lasted many months.   After several of the rulings of the trial examiner, excluding evidence, were overruled by the Board, additional evidence was received.   In July, 1939, the decision and the order of the Board above referred to were issued.

The principal question to be determined on this appeal is whether there was substantial evidence to support the decision of the Board. Substantial evidence is more than a mere scintilla.   It means such relevant evidence as a reasonable mind may accept as adequate to support a conclusion. (See *Edison Co.* v. *Labor Board,* 305 U. S. 197, 229.)   Under the statute creating the Board, it is free from the restrictions of the technical rules of evidence.   This freedom does not, however, justify orders without a basis in substantial evidence of rational probative force.   Mere uncorroborated hearsay or rumor does not constitute substantial evidence.   (See *Edison Co.* v. *Labor Board, supra.*)

It is not the duty of the courts to weigh the evidence, or to reject a choice made by the Board where it sees fit to believe one witness as against another, or where the evidence is conflicting and room

for the Board's choice exists.    (See *Matter of Stork Restaurant, Inc.*, v. *Boland*, 282 N. Y. 256.)

The New York State Labor Relations Act █ leaves an employer free to employ or discharge his employees as he sees fit, for good reason or for poor reason, or for no reason at all — subject only to one limitation, that he may not require an employee, or one seeking employment, as a condition of employment, to join any company union, or to refrain from forming or joining or assisting a labor organization of his own choosing.    (*Matter of Stork Restaurant, Inc.*, v. *Boland, supra.*)

Keeping in mind these cardinal views as controlling, we must determine whether there was that substantial evidence in the present case which the law requires to support the Board's order. This case differs in several respects from many others which have come before us.   It differs first in that there is no claim in the present case that the employer favored or attempted to form any company union, or that it ever refused to treat with union representatives.   No election of a representative for collective bargaining was ever held or sought.   The second distinguishing feature is that a great part of the testimony received to support the alleged acts of discrimination by the employer in this case related to occurrences which took place before the State Labor Relations Act went into effect.   The effective date of the statute was July 1, 1937.   One of the reinstated employees involved herein was discharged before the effective date of the statute.

Another somewhat unusual feature is that one of the reinstated employees admitted that she voluntarily resigned her employment, but claimed that she did so because she was discriminated against by the employer's harassing tactics, which rendered her extremely nervous.   The two remaining reinstated employees were discharged after the law took effect for conduct occurring during the pendency of the statute.   The question as to them is whether the proof discloses that union activities was the real reason for the discharge of either of them.

It appears from the evidence in this case that the employer, Frank G. Shattuck Co., conducts a large chain of restaurants and candy stores.   It has thirty stores in the metropolitan district, and others in other parts of New York State, and in nearby States. All of these stores are conducted in the name of " Schrafft's." The employer has some 5,700 employees, and the annual turnover in personnel is said to be about 4,000 employees.   A great deal of the employer's business is done through personal service rendered to customers, who come to purchase food, drink, candy or cakes.

It needs hardly to be said that the success of such a business depends upon maintaining discipline among the employees, so as to assure a high standard of service to the public.

The proof discloses that at a time several months before the effective date of the statute, when there was no legislative definition of " unfair labor practice," nor any declared public policy with respect to the right of unionization or collective bargaining, the employer discharged a group of employees. These employees at the time of their discharge were attempting to organize a union among appellant's employees. Since their discharge they have been actively employed as organizers by one union or another which has continued the effort to unionize appellant's employees.

A great deal of the testimony in the record relates to the circumstances concerning the discharge of this group which took place prior to the effective date of the statute. Much of the decision of the Board relates to the discharge of this group.

When testimony concerning acts prior to the effective date of the statute was first offered, the trial examiner of the Board questioned the propriety of receiving it. Counsel for the Board contended that acts occurring before the law went into effect would lead to the inference that facts occurring subsequent to the effective date of the statute were true, and that the prior acts should be admitted in evidence for that purpose. He said that he realized that such acts could not be deemed unfair labor practices, but contended they were competent to show motive. With respect to this contention, the examiner inquired in substance as to what would become of the presumption that everyone acts in accordance with law, if he determined the motive subsequent to the effective date of the statute on the basis of acts that took place before the law went into effect.

He further said:

" You now proceed with testimony that shows that respondent committed certain acts which, if they had been committed after the law went into effect, would be a violation of the law. From which you would reason, as I take it, that inasmuch as there was motive prior to the law went into effect, in engaging in anti-union activities, therefore, we may deduce motive to violate the law after the law became into effect, by reason of similar actions.

" Now, I don't believe that this is logical and I don't think it is fair, because I can conceive of a respondent employer being bitterly anti-union before the law went into effect, and being equally anti-union after the law went into effect but nevertheless realizing that being the law, it had to be followed, it had to be obeyed, it had to be complied with. And, therefore, when you proceed with testi-

mony upon the allegations of the complaint — and this is, as you say, a fact finding body — when you proceed upon the testimony on the specific allegations of the complaint for me to determine whether or not these charges are substantiated — not upon the testimony pertaining to those specific charges, but upon what the respondent did prior to the law having gone into effect — certainly, in a court of law, it would seem highly prejudicial.

" While I am mindful that we are not governed by technical rulings of evidence, and while I believe that we shouldn't be governed by technical rulings of evidence, I think it is going way deep and way beyond the necessities of the case, to say that in determination of the specific questions of fact raised by the complaint, and answered, I should keep back in my mind what the employer did before the law went into effect. I don't believe this is now a question of rule of evidence. I think it is a question of predetermining whether or not a respondent is guilty, on the basis, not of what is proved at this hearing with reference to the allegations in the proceeding, but on the basis of what the employer did prior to the law going into effect. Unless I were shown very definite authority to that effect, I wouldn't be inclined to accept any such supposition."

In accordance with the views thus expressed, the examiner ruled out the evidence as to prior acts. This ruling was reversed by the Board, which required him to receive the evidence.

In its decision the Board referred to the discharges prior to the effective date of the statute, as follows:

" These discharges occurred prior to July 1, 1937 and therefore prior to the effective date of the New York State Labor Relations Act. As a result, it was not alleged in the complaint, and the Board cannot find that those discharges constituted violations of the Act. They are extremely significant, however, in showing a course of conduct on the part of the respondent of discharging employees who were known to them to be active in behalf of a union, as indicating an intention on the part of the respondent to break up a union movement and discourage employees from taking part in one, and as showing a motive and a plan on the part of the respondent for discharging employees based on the union activities of those employees.

" It should be pointed out that there is no affirmative reason for believing that respondent's attitude towards unionization changed after the effective date of the New York State Labor Relations Act. * * * "

Counsel for the Board has cited to us authorities holding that evidence concerning the attitude of the employer before the effective date of the passage of the law is material to show a course of conduct

or motive of the employer after the passage of the law. While we do not think that these authorities are in point, being distinguishable on the facts, it is unnecessary to pass upon the question as to whether evidence of this nature was receivable. The employer introduced evidence, which was undisputed, which showed that immediately upon the passage of the law it called meetings of its store managers and assistant managers to advise them as to the effect of the new law, and directed that they should obey it. It is conceded that at these meetings the ranking officials of the employer explained the law in detail from a written memorandum, and stated that nothing was to be done to encourage or discourage union activities. The store managers were told that it was the policy of the company that the law must be obeyed, and that if any union activities happened that appeared out of order, the managers were to communicate with the main office before they took any action.

The probative force of what occurred at these meetings appears to have been entirely disregarded by the Board, excepting that it appears to have found from the mere direction to the store managers to report union activities to headquarters that the employer was continuing its animosity towards labor unions. We think that this finding was wholly unwarranted. The proof supported the presumption that the employer would obey the law, giving affirmative evidence of its intention to do so. Therefore, even if the evidence of prior acts had been properly received, we cannot see how any probative value remained in such proof, in so far as it was used to show the attitude of the employer after the effective date of the statute. But the seriousness of the error of the Board was in connection with the weight which it gave to the proof of such prior conduct. Its decision shows that it took the evidence of conduct prior to the passage of the law to show the attitude of the employer toward discharging employees because of their union activities; and the decision then stated that no affirmative reason was found for believing that the employer's attitude towards unionization had changed after the effective date of the New York State Labor Relations Act. This improperly placed on the employer the burden of producing affirmative proof that its attitude had changed. Its effect was to shift the burden of proof from the Board, which was required to produce competent proof that the discharge of the employees constituted unfair labor practices committed after the effective date of the statute, and placed upon the employer the burden of showing that its attitude prior to the passage of the law had changed. The evidence shows that the employer had discharged the persons who were let out before the passage of the law at a time when sitdown strikes were prevalent in the country.

The discharged employees were attempting to form a union under the same auspices as those which were conducting the sitdown strikes. The law then placed no restrictions upon the employer's right to discharge for such activities. Can it be said that because of these acts of the employer, when it had a legal right to do what it did, the Board should infer unlawful animosity towards labor after the passage of a law of this State forbidding interference with union activities? We think that any such finding violates all reason and logic. We think that unless other evidence is found to support the Board's decision, it should not be enforced.

We think that the questions connected with the propriety of the orders of reinstatement, and the order concerning surveillance must be tested by a search of the record for proof as to misconduct on the part of the employer after the effective date of the statute. Before reviewing the testimony with respect to the four discharges involved, we wish to point out that much of the evidence received was not only hearsay, but consisted largely of rumor and gossip. While we appreciate that the State Labor Relations Act does not require the exclusion of hearsay evidence, we think it necessary to indicate that this freedom of action does not permit the Board to make findings on mere rumor or gossip such as alleged statements by one store manager to another as to what they believed to be the attitude of the officials of the employer corporation with respect to union labor. A mass of such testimony was received in this case. This sort of " evidence " is not substantial proof. If such proof can be made the basis of findings seriously affecting property or personal rights, such rights can be destroyed without the semblance of a fair trial.

The four persons whose reinstatements were ordered by the Board were Nelson C. Neustrup, a bartender; Joan Kelliher, a waitress; Sylvia Meltzer, a waitress; and Karl Claus, a baker's helper. We will discuss the facts concerning the alleged discrimination in these cases seriatim.

Nelson C. Neustrup was ordered reinstated with back pay, although the testimony discloses that his services had been terminated on June 19, 1937, before the effective date of the statute, and that he had not been re-employed or paid any compensation thereafter. The Board found that Neustrup was not discharged until after July first. It did so because of Neustrup's testimony, the substance of which was that he had not been definitely advised that he would not be re-employed before July first, and that some of the administrative officers whom he visited in attempting to obtain reinstatement had told him to return at a later date for their answer. This finding of the Board absolutely ignores the fact that

Neustrup himself, in a letter signed by him, directed to one of the company's officials, had stated that he was discharged on June 20, 1937. Neustrup had been employed by Schrafft's for about seven years. During that period he had worked in various places and in different capacities. Eventually he was employed at the Forty-second street store of the employer as a bartender for a year and a half prior to June 17, 1937. On that date he was transferred to a store at 625 Madison avenue. Neustrup conceded that he was unhappy because of the transfer, and admitted that within a day or two after he started working in the Madison avenue store he had a controversy concerning the lack of variety in the food which was served to him. It might be well to note that Neustrup's own letter asking reinstatement denied that he had any such controversy, but in his testimony before the Board he admitted making a complaint concerning the fact that he had been served roast beef for two days in succession. It may be added that he received this food free of charge. He contended that this complaint concerned the lack of variety in his diet was made in a quiet fashion to his superior; but there was ample testimony to show that he made his protest in a loud voice, in the hearing of numerous other employees. Undoubtedly, to an employer conducting a public restaurant, a public remonstrance of this nature by an employee would justify his discharge. Neustrup admitted that he was dismissed immediately after his complaint was called to the attention of his superior. His letter showed the reason assigned for his discharge. He made no claim in the letter that union activities had anything to do with the employer's action. Despite this, the Board found that he was discharged because of discrimination against him due to labor activities. The only basis in the record for a finding that the employer had any knowledge of union activities on Neustrup's part, was proof to show that Neustrup had been elected an officer of the proposed union a few days before his transfer, and that some person who stated he was employed by a firm bearing a name similar to that of the employer's attorney had made inquiry at union headquarters concerning the names of the union's officers. Upon this flimsy evidence, without further identifying the person to whom it is alleged the list of officers was given, the Board found that Neustrup was transferred and eventually discharged because of his employer's knowledge of his connection with the union.

While we do not feel that it is our duty to re-evaluate the evidence in this class of case, we think we are required to say that there was no substantial evidence whatever that Neustrup was discharged because of labor activities. In any event, even if he were discharged for such activities, it is clear that he was discharged before

the effective date of the statute, and there was no obligation on the part of the employer to take him back after the New York State Labor Relations Act became effective, in the face of what he admitted happened just prior to his discharge. We find that the order for his reinstatement was wholly unwarranted, and that part of the order of enforcement relating to such reinstatement should be set aside.

The second of the employees ordered reinstated was one Joan Kelliher. This girl was a waitress who had been employed by Schrafft's for upwards of five years. She had been transferred many times during her employment from one store to another. Shortly before she left her employment she was twice transferred. First she was sent to a store in the Bronx to replace a sick employee. After two weeks, when the one she replaced returned, she was again transferred to a store in the Chrysler Building in Manhattan. The Board attempted to establish that the Chrysler Building store had the reputation of being a place where employees were transferred as a preliminary step to discharge. But the proof to this effect was entirely based on rumor and gossip, and could not be dignified by the word "evidence." Miss Kelliher concedes that she was dissatisfied with the transfers, and that when she went to the Chrysler Building store she wondered how long she was going to stay there. She testified that she was constantly criticized by her superiors in that store. She states that these criticisms were, in her opinion, unwarranted. She further stated that the supervisory help kept her under constant surveillance until her nerves had been strained to the breaking point, and that because of such nervous condition which rendered her unfit to work, added to the factor of hot weather, she voluntarily resigned her employment with Schrafft's on August 27, 1937.

Assuming that the evidence showed that an employer had so unfairly harassed an employee because of union activities that it was rendered dangerous to the health of the employee to remain and that the proof justified a finding that the action of the employer was to induce a resignation and might be found to be an unfair labor practice and equivalent to a discharge, we fail to find any substantial evidence of such conduct in this case. The finding of the Board that Miss Kelliher left because she was forced out by " hounding " tactics, due to her union activities, entirely disregards many admissions made by her, together with the testimony of all other witnesses with relation to what occurred.

Miss Kelliher concedes that despite her alleged physical condition due to harassment, she obtained another position with a different employer on the same day that she left Schrafft's and received

higher wages in her new position. She continued to work steadily in the new position for two and one-half months. She concedes that before she left Schrafft's she did not give any reason for resigning, and said that she did not protest against the alleged harassment because she thought no one was interested.

The evidence discloses that when Miss Kelliher arrived at the Chrysler Building store she was rebellious because of the transfers, and she admitted that she felt she was being discriminated against. She conceded that she was frequently admonished for her poor work. To ignore this proof and to hold that one who voluntarily leaves under these circumstances is entitled to reinstatement because of unfair labor practices, means that such reinstatement would be based on surmise and suspicion, disregarding the substantial evidence produced. It is not necessary to review at length the mass of evidence contradicting what Miss Kelliher said, but, on her own admission alone, it appears unwarranted to find that this employee, who left voluntarily, is entitled to reinstatement. The finding of the Board in this respect should not have been supported by an enforcing order, and this part of the order should be set aside.

The third employee was Sylvia Meltzer, who was first employed by Schrafft's in 1936. During her employment she was transferred several times at her own request. Her last transfer was on October 7, 1937, when she was sent to the store in the Chrysler Building. She admitted that she had asked for a transfer just prior to this date, but said that she had requested to be sent to a full-time store. She was then on part-time, and after her transfer received only part-time work. Miss Meltzer was discharged on or about October 14, 1937.

The employer produced numerous witnesses who testified to Miss Meltzer's lack of neatness and inefficiency, and to the frequent complaints that were made about her work, including complaints made by a customer as well as supervisory employees. The employer contended that Miss Meltzer was discharged because of these complaints.

As against this proof, there was testimony to show that Miss Meltzer was quite openly active in union affairs; that her discharge came shortly after she had made a speech in the union headquarters.

While the finding that she was discharged because of union activities is based wholly on circumstantial evidence, we cannot say that there is no substantial evidence to support the finding of the Board in this case. We think that at least there was enough to make the choice that of the Board, and, while if we were passing upon the weight of the evidence we might arrive at a different

conclusion, we do not conceive it our duty to make such a determination, for the statute does not presently give us the right to do so. Under the circumstances, we feel that we must affirm the order of enforcement made with respect to this employee's reinstatement.

The fourth employee ordered reinstated, Karl Claus, was employed as a baker's helper in the main factory of the employer. The employer's contention was that this man was discharged because of his troublesome character and belligerent attitude, and also because of a complaint concerning the nature of his work. The evidence concerning Claus' union activities related largely to general statements made by him in the presence of other employees concerning the benefits that might come from a union, and concerning efforts to obtain higher pay. These statements were made to his foreman and to others. The supervisory employees, who effected Claus' discharge, all denied that his statements favoring a union had any connection with his discharge or that they ever heard of them. If these were all the facts in the case concerning Claus, we might also find that in his case the choice was to be left to the Board, and that the court might not interfere with the disposition made; but a reading of Claus' own testimony discloses beyond any question of doubt that he was obnoxiously belligerent and a troublesome employee. There was proof that an intention to discharge him had been evidenced by statements of his superiors long before the date when Claus joined the union or made any statements favoring the union. We need not set forth at length the testimony of Claus which showed by his own admissions that he was frequently attempting to interfere with other employees, and to direct their conduct, although his position did not permit him to do so. It may be sufficient to refer to one set of circumstances: The employer had a system known as "The Bedaux System" installed in its factory, whereby employees might measure their efforts by a certain standard and obtain a bonus in pay, provided their work exceeded the standard fixed. The merit of their work was arrived at by fixing certain marks, and the employees were required to make entries of what work they had performed to ascertain what marks had been earned. Claus admitted that for weeks before his discharge he had suspected that other employees were cheating in recording their work. As he stated it, "they had long pencils and I had a short one," and "the amount of the marks depend upon the length of the pencil." Because of this suspicion as to the conduct of his fellow-employees, Claus apparently appointed himself a committee of one to supervise all of the entries which they made. He admitted that he had frequently criticized others concerning the marks which they made, and his belligerent

attitude towards his fellow-employees was established out of his own mouth beyond a peradventure. He conceded that when he was discharged one of the reasons assigned was this attitude on his part. We think that to say that there was substantial evidence that his discharge was due to union activities is entirely unjustified in the face of Claus' admissions. The claim of the employer was overwhelmingly supported by the other proof in the case. Under the circumstances, the order of the Board reinstating Claus was unwarranted, and the enforcing order, in so far as it supports the same, should be reversed.

The custom of the intervenor union as disclosed in this record was to engage discharged employees of Schrafft's as union organizers. The evidence discloses that persons so engaged received a fixed sum weekly from the union. However, the contention is made that the money received by organizers was not pay, but was expense money, which they were supposed to disburse in attempting to secure recruits for the union.

The evidence also discloses that many of these union organizers had made application for unemployment insurance, and that upon the advice of the union they withheld use of some of the checks received until it should be determined whether they would be reinstated, in order that they might secure larger back pay, if and when so reinstated. We do not conceive it is our duty at this time to pass upon the question as to the amount of pay that would be properly allowed to a reinstated employee receiving money as above indicated. When that question arises, it will be considered.

The remaining important feature of the order appealed from relates to the direction that the employer desist from acts of surveillance. These acts principally involved the conduct of managers and assistant managers of various stores at times when distribution of circulars was being made by union organizers to employees of Schrafft's. The evidence concerning these acts of surveillance is not substantially disputed, and the findings with respect thereto do not depend upon the conduct of the employer prior to the effective date of the statute. It is conceded that the managers of the stores were accustomed to place themselves in a position alongside of, or near, those union organizers who were attempting to distribute leaflets to employees leaving the stores. The conduct of the managers was conceded to be orderly and, in many instances, friendly to those distributing the leaflets. However, it seems to us that the Board was warranted in finding that this action was improper surveillance, and to find that the object, or at least the effect, of the store managers' conduct was to discourage and prevent employees from taking the leaflets which were offered to them by

the organizers. The evidence concerning surveillance also disclosed that at times the store managers, upon catching sight of the organizers for the union outside the premises, would send employees out of exits other than those ordinarily used by the employees. There was also evidence that the store managers at times examined the lockers of various employees, entering them by pass-keys, in order to determine whether the union literature was contained therein, and that on occasions, when found, such literature was removed. The Board was warranted in finding that such conduct was an interference with, or restraint upon, the rights of the employees to self-organization, as guaranteed by section 703 of the Labor Law.

In so far as the order directed the employer to cease and desist such actions, we think it should be upheld.

Accordingly, we modify the order appealed from in so far as it grants the application of the Board to enforce in whole its order dated July 11, 1939, by refusing to enforce those parts of the order with respect to the reinstatements of Nelson C. Neustrup, Joan Kelliher and Karl Claus, and as so modified the order appealed from should be affirmed.

O'MALLEY, GLENNON and COHN, JJ., concur; MARTIN, P. J., dissents and votes to reverse the order in its entirety.

Order modified in so far as it grants the application of the New York State Labor Relations Board to enforce in whole its order dated July 11, 1939, by refusing to enforce those parts of the order with respect to the reinstatement of Nelson C. Neustrup, Joan Kelliher and Karl Claus, and as so modified affirmed. Settle order on notice.